## PITTMAN v. STATE.

No. A-11996.

Criminal Court of Appeals of Oklahoma.

June 2, 1954.

David Tant, Oklahoma City, Meacham, Meacham, Meacham & Meacham, Clinton, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Sam H. Lattimore, Asst. Atty. Gen., for defendant in error.

JONES, Judge.

The defendant Lee Pittman was charged by an information filed in the District Court of Custer County with the crime of assault and battery with intent to kill his wife, Inez Pittman; was tried, convicted and in ac-cordance with the verdict of the jury was sentenced to serve five years imprisonment in the penitentiary and has appealed.

Two assignments of error are presented in the brief of defendant, to-wit: (1) The trial court erred in giving instructions numbered seven and eight, pertaining to the law of self-defense. (2) The trial court erred in admitting in evidence the tran-script of the testimony of Edna Weil, taken at the preliminary examination.

The undisputed evidence showed that on December 5, 1952, defendant's wife, Inez Pittman, was sitting at a booth in Stack's Bar in Clinton with one Pat Bradford about 9:00 p. m. Defendant entered the bar, pulled his pistol, shot and killed Bradford and then fired four shots into the body of his wife, causing her serious personal in-juries from which she later recovered.

The instructions to which objection was made at the trial were as follows:

"In this case, the defendant, in sup-port of his plea of not guilty, claims as a justification of the alleged assault, that he acted in self-defense of his person, and you are instructed that under the law, before a person can justify such alleged assault upon the plea that he acted in self-defense, there must not only have existed at the time of the alleged assault reasonable ground to apprehend a design on the part of the assaulted person to either take the life of the defendant or to do him some great bodily injury, but in addition thereto it must reasonably have appear-ed to the defendant that there was at the time imminent danger of such de-sign being carried out.

"You are further instructed that any person, who, without having sought a difficulty and without having wilfully provoked it, or voluntarily entered into it, is assaulted or threatened with an immediate assault by another with such means and under such circumstances as would cause a reasonable man in like situation to believe that he was in danger of being killed or of receiving great bodily injury at the hands of the other, has the right for the preservation

of his own safety to use such force and violence upon his assailant as would reasonably appear to the person assaulted to be necessary to avert the threatened danger, even if it involved the taking of human life.

"And, in such case, if the assaulted person is in a place where he has a right to be, and the danger is not of his own seeking or wilfully provoked by him he is not required to flee from it, but he may resist it with adequate and necessary force until he is safe."

It is contended by defendant's counsel that the above instructions were erroneous for the reason there was no contention that defendant at the time he fired the shots at Inez Pittman was defending himself against her, but that in exercising self-defense against Bradford he accidentally shot her. Complaint is made that in the two instructions which were given, the jury was advised that there must have existed at the time of the assault reasonable ground to apprehend a design on the part of the assaulted person (who in this case was Inez Pittman) to either take the life of defendant or to do him some great bodily harm. There would have been substantial merit to this contention if the proof of the defendant had shown that the defendant, while shooting at Pat Bradford in his own necessary self-defense, had accidentally shot his wife, an innocent bystander.

 In Dean William L. Burdick's excellent treatise on the Law of Crime, Volume Two, page 143, he states that it is excusable homicide "where one in lawful defense of self * * * accidentally kills some third person."

In Caraway v. State, 98 Tex.Cr.R. 119, 263 S.W. 1063, it was held:

"Where accused, in shooting at J., unintentionally killed M., accused's guilt or innocence depended on whether the act of firing at J. was culpable or justifiable."

In Pinder v. State, 27 Fla. 370, 8 So. 837, 838, it was held:

"Where it is deducible from the evidence that the killing of the deceased by the defendant was wholly unintentional, and accidentally brought about by the excusable or justifiable defense of himself against impending danger from a third party, it is error for the court to charge the jury that, in order to avail himself of the plea of self-defense, 'it is necessary that the defendant should have perpetrated the act under the well-grounded belief, justified by the surroundings, that it was necessary to take the life of the "person slain" in order to save his own life,' etc.

"If the killing of the party intended to be killed would, under all the circumstances, have been excusable or justifiable homicide upon the theory of self-defense, then the unintended killing of a by-stander by a random shot, fired in the proper and prudent exercise of such self-defense, is also excusable or justifiable."

See also 6 C.J.S., Assault and Battery, § 92, page 944.

It becomes necessary, then, to summarize the evidence, both of the State and the defendant, to see whether there was any proof that defendant was acting in his own necessary self-defense when he fired the shots at Inez Pittman or whether there is any evidence that he was firing at Pat Bradford in his own necessary self-defense and accidentally and unintentionally injured his wife.

The proof of the State showed that the defendant, aged 60, married Inez Pittman after the parties had only been acquainted for three days. This marriage occurred in 1950, and there were 29 years difference in the ages of the parties. Their married life was a turbulent one. On two occasions the wife left the husband and on one of these occasions she lived with her father and mother at Coweta for four and a half months before returning to live with defendant.

The defendant and Mrs. Pittman operated a beer tavern in Clinton. Mrs. Pittman would occasionally become intoxicated and the proof is conclusive that she associated with other men than defendant.

On the evening of the shooting, the proof of the State showed that Pat Bradford had

gone to Stack's Bar early in the evening and that about 40 minutes after he had arrived at the bar, Mrs. Pittman came to the bar and sat down in the same booth but across the table from Bradford. A few minutes later, defendant entered and, according to two disinterested eye witnesses, he walked back to the rest room, turned, and walked back toward the front of the tavern and when he came to the booth where Bradford and Mrs. Pittman were sitting, he shot Bradford, who slumped and fell dead out of the booth onto the floor. Then defendant turned and fired four or five times at Mrs. Pittman. Mrs. Pittman was yelling during the time that defendant was doing the shooting, "No, Lee, No!"

After defendant had finished shooting, he walked from the tavern and was arrested several minutes later at his place of business. He was still armed with the pistol with which he had done the firing at the time of his arrest.

Mrs. Pittman testified that she was sitting in the booth with Bradford and she first noticed defendant after he had entered the bar; that defendant walked to the rear towards the men's rest room and then started back at a very rapid pace toward the booth where she was sitting. She noticed that he had a gun in his hand. When he reached the booth, he said, "Now I am going to kill both of you son-of-a-bitches." That Bradford turned his shoulder and was shot in the back and fell out on the floor of the tavern; that defendant then turned and started shooting her and she said, "Lee, don't do that," but he continued to fire until she had received five wounds. She was struck in the elbow, breast, stomach, and leg, with a bullet still remaining in her leg at the time of trial.

On behalf of the accused we have been unable to find any evidence to substantiate any theory of self-defense, either as against an attack made upon the accused by Bradford or Mrs. Pittman. If we correctly understand the record, the sole defense which was interposed was that of temporary insanity. To lay the basis for this claim, defendant's brother testified that he noticed a change come over his brother after the separation of him and his wife; that he had a different look and a different mood and was glassy-eyed; that he was restless and could not sleep at night, and would get up and leave his business during the daytime and take walks of 15 or 20 minutes, and the witness was permitted to state that he doubted that his brother knew the difference between right and wrong at the time of the shooting. The defendant himself testified that he was in love with his wife, although admitting that he was much older than she and that he had been married three times before he met her; that his wife commenced to run around with other men when she was drinking; that on one occasion, when his wife had separated from him and was staying at Frances Downey's he saw Pat Bradford go over to the Downey place and stay until about one o'clock; that he talked to Bradford about running around with his wife and Bradford told him that he could do nothing about it and that if he tried to that he would kill him. At the time of the fatal difficulty, defendant testified that he walked into Stack's Bar, went to the back and as he was walking toward the front and came opposite the booth where Pat Bradford and his wife were sitting, that Bradford "kindly started up, and that is the last thing I remembered." The record shows the following questions of defendant and answers by him:

"Q. Do you remember shooting him? A. No, sir; I don't remember shooting him.

"Q. Do you remember at the time he raised up like that and you started out did it scare you? A. I don't know, I was pretty nervous.

* * * * * *

"Q. You don't know how many shots you fired? A. No, sir.

"Q. You don't know whether you shot your wife? A. I don't know if I shot anybody or not.

"Q. How long, if you know, was your mind in a blank there? A. Well, I went on out and got out in the air, and I headed back east and Don said to me 'Where to now, Lee' and I

said 'Well, I guess I will go back down to the place.'

"Q. To your place of business? A. Yes."

 Counsel now insists that one of their defenses at the trial was self-defense against Bradford. They state that the court should have given an instruction pertaining to the law of self-defense but that the jury should have been advised that the person against whom defendant was defending himself was Bradford and not his wife. It is significant that no requested instruction on this purported issue was ever presented to the court. There is just as much evidence in the record that defendant at the time the shots were fired was defending himself against Mrs. Pittman as there was evidence that he was defending himself against Bradford. There was an absolute lack of evidence that he was acting in self-defense, and it was unnecessary to submit the issue of self-defense to the jury. The question then arises as to whether the giving of the instructions on self-defense where such was not an issue in the case resulted in substantial prejudice to the accused and deprived him of a fair trial. We cannot perceive where the defendant suffered any material prejudice by the giving of these instructions. If anything, they placed an additional burden on the State. The jury was fully instructed on the law pertaining to temporary insanity at the time of the commission of the alleged crime, and from the nature of the evidence offered on behalf of the defendant, the jury could not have failed to understand that the sole defense was that of temporary insanity. Counsel for defendant not having presented a requested instruction on self-defense in accordance with the theory which they now present to this court, it is apparent that the trial court in giving the instructions to which objections were made, thought that he was giving the defendant the benefit of every doubt pertaining to any defense which he might have.

As to the second assignment of error, the record shows that Edna Weil testified at the preliminary examination that she had known defendant for 12 or 14 years and had worked for him in his tavern at Clinton; that after Mrs. Pittman had separated from defendant the defendant told Mrs. Weil he was going to kill his wife and whoever he caught with her if he caught them together. The direct testimony of this witness occupied one and one-half pages of the record and the cross examination by defendant's counsel covers five pages of the record. Counsel for defendant exercised fully his right of cross examination and many of the questions asked by counsel were wholly irrelevant but were evidently asked in an attempt to discredit the witness.

At the time of the trial in the district court this witness did not appear, although she had been duly subpoenaed. Dr. Floyd Simon testified that he was called by a neighbor of Edna Weil on the day before the trial because the latter had fainted. From the history which she related he determined that she was pregnant, and he advised her to remain in bed for at least two days; that he did not examine Mrs. Weil for the reason that an examination might induce a miscarriage and that his testimony and diagnosis of pregnancy was made on the basis of the history which she gave. He further testified:

"Q. Do you think it was even dangerous or would endanger her life to appear in Court? A. I wouldn't say her life but I would say if she is pregnant and if she is having the cramping as she complained of and as she exhibited yesterday it could well cause the termination of a pregnancy in miscarriage which I don't think is advisable."

 In the case of Hamilton v. State, Okl.Cr., 244 P.2d 328, 329, this court held:

"Where a witness has testified at the preliminary examination against an accused, and has been cross-examined, or the privilege of cross-examination offered, if at a subsequent trial involving the same issue it is satisfactorily made to appear that the witness has died, has become insane, or has permanently left the state, without collusion or procurement, or is sick and unable to attend, or his whereabouts

cannot with due diligence be obtained, a transcript of the testimony of such witness may be introduced as his evidence, and the use thereof will not be a violation of the constitutional right of the accused to be confronted with the witnesses against him.

\* \* \* \* \* \*

"When the question as to the admissibility of evidence given at a preliminary examination or former trial is presented, the trial court is vested with a discretion in determining the sufficiency of the predicate that it laid for the purpose of introducing such evidence; and his ruling upon such question will be upheld unless this court can say from an examination of the record that the court abused his discretion."

See also Sweet v. State, 70 Okl.Cr. 443, 107 P.2d 817.

It is important that in the trial of every criminal case wherever it is possible to do so, the witnesses should be forced to appear so that the jury may personally observe their demeanor on the witness stand and thus be in a better position to judge their veracity and credibility. However, in every instance it is not possible for witnesses to appear, and the above rules of law have been long established which govern in determining the admissibility of evidence given by an absent witness at a former hearing where the defendant had ample opportunity of cross-examination. In determining the admissibility of such former testimony, the trial court is necessarily vested with a large amount of discretion in determining whether the witness actually is physically unable to attend the trial. In the instant case it is our conclusion that there was no abuse of discretion. In a case where the factual issue of guilt or innocence was closer than the one here presented, a different conclusion might be reached.

It is evident the jury paid little attention to the testimony of Edna Weil. There was no evidence showing a legal justification for this shooting and the jury only fixed the punishment of the accused at five years imprisonment in the penitentiary. The shots fired into the body of his wife were almost fatal, and in a majority of cases would have resulted in death. Under all the facts and circumstances, it appears that the punishment assessed the accused was fair and reasonable and the judgment and sentence of the District Court of Custer County is accordingly affirmed.

POWELL, P. J., and BRETT, J., concur.